IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| YOUNG MEN'S CHRISTIAN ASSOCIATION OF HONOLULU, a Hawaiʻi nonprofit corporation, | CIVIL NO. 18-00241-LEK-RLP |
| Plaintiff, | MEMORANDUM IN SUPPORT OF MOTION |
| vs. | |
| ALOHA KAI DEVELOPMENT, LLC, a Hawaii limited liability company; MB PROPERTY ACQUISITIONS, LLC, a Delaware limited liability company; MICHAEL BLUMENTHAL; TAMA HOME AMERICA, LLC, a Hawaiʻi limited liability company; TAMA HOME CO., LTD., a Japanese corporation, | |
| Defendants. | |

# TABLE OF CONTENTS

I.  INTRODUCTION ............................................................................. 1

II.  FACTUAL AND PROCEDURAL BACKGROUND ......................... 5

    A.  AKD Was Formed as a Limited Liability Company Whose Sole Purpose Was Entering into and Performing the PSA .......... 5

    B.  The Parties Entered into the PSA, Which Was Thereafter Terminated by Plaintiff ................................................................. 6

    C.  MBPA and THA Funded Holding Escrow Accounts in their Names With Conditional Loans to Close a Potential Deal with Plaintiff ............................................................................... 7

    D.  Plaintiff Initiated Arbitration Against AKD ................................ 10

        1.  Plaintiff's Efforts to Exclude MBPA and THA from the Arbitration ................................................................. 11

        2.  Plaintiff's Efforts to Enjoin the Holding Escrow Accounts Belonging to MBPA and THA .......................... 12

        3.  Arbitration Award ............................................................ 16

        4.  Relevant Procedural History ............................................ 17

III.  LEGAL STANDARD ...................................................................... 17

IV.  ARGUMENT .................................................................................... 19

    A.  Plaintiff's Claims in Count I and II for Intentional and Constructive Fraudulent Transfers Fail Because AKD Did Not Make a "Transfer" of an "Asset" ......................................... 21

    B.  Plaintiff's Claim to "Peirce the Corporate Veil" Must Be Dismissed Because it is Not an Independent Claim and Plaintiff Has Not Alleged Sufficient Facts to State a Claim ........ 25

1.    "Piercing the Corporate Veil" Is Not an Independent
      Cause of Action.................................................................26

2.    The Corporate Veil Cannot Be Pierced Where Plaintiff
      Entered into the PSA With Full Knowledge that AKD
      Was a Limited Liability Company.....................................27

V.    CONCLUSION ........................................................................33

# TABLE OF AUTHORITIES

**Page No.**

## CASES

*Advanced Tel. Sys., Inc. v. Com-Net Prof'l Mobile Radio LLC*,
    846 A.2d 1264 (Pa. Super. 2004) .................................................... 31

*All. Bancorp v. Select Mortg., L.L.C.*,
    No. 274853, 2008 WL 724092 (Mich. Ct. App. Mar. 18, 2008) .... 22

*Baldwin v. Matthew R. White Investments, Inc.*,
    669 F. Supp. 1054 (D. Utah 1987) .................................................... 31

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) .......................................................................... 18

*Chung v. Animal Clinic, Inc.*,
    63 Haw. 642, 636 P.2d 721 (1981) .................................................. 28

*DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.*,
    540 F.2d 681 (4th Cir. 1976) ........................................................... 32

*Dole Food Co. v. Patrickson*,
    538 U.S. 468 (2003) .......................................................................... 19

*Dorrance v. Lee*,
    90 Hawai`i 143, 976 P.2d 904 (1999) .......................................... 24, 25

*Erie v. Tompkins*,
    304 U.S. 64 (1938) .............................................................................. 4

*Feitshans v. Kahn*,
    No. 06 Civ. 2125, 2006 WL 2714706 (S.D.N.Y. Sept. 21, 2006) .. 27

*Five Points Hotel P'ship v. Pinsonneault*,
    No. CV-11-00548-PHX-JAT, 2014 WL 1713623
    (D. Ariz. May 1, 2014), *aff'd*, 697 Fed. Appx. 549
    (9th Cir. 2017) ................................................................................. 26

*Hanna v. Plumer,*
    380 U.S. 460 (1965)..................................................................... 4

*Hanson v. Bradley,*
    10 N.E.2d 259 (Mass. 1937) ........................................................ 33

*Henry Waterhouse Trust Co. v. Home Ins. Co. of Hawaiʻi,*
    27 Haw. 572 (1923) .................................................................... 30

*Hilo Crane Serv. v. Ho,*
    5 Haw. App. 360, 693 P.2d 412 (1984) ........................................ 30

*In re Milby,*
    875 F.3d 1229 (9th Cir. 2017) ..................................................... 22

*In re Polo Builders, Inc.,*
    388 B.R. 338 (Bankr. N.D. Ill. 2008) ........................................... 32

*In re Sia,*
    349 B.R. 640 (Bankr. D. Haw. 2006) ................................... 4, 22, 23

*Luckett v. Bethlehem Steel Corp.,*
    618 F.2d 1373 (10th Cir. 1980) .................................................... 31

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986)..................................................................... 18

*Peacock v. Thomas,*
    516 U.S. 349 (1996)..................................................................... 26

*Robert's Hawaii School Bus, Inc.,*
    91 Hawaiʻi at 241, 982 P.2d at 870 ............................... 26, 27, 28, 30

*Rosen v. Kessler,*
    51 A.D.3d 761 (N.Y. App. Div.2008) ........................................... 26

*Serio v. Baystate Properties, LLC,*
    60 A.3d 475 (Md. App. 2013) ...................................................... 32

*Taylor v. List,*
  880 F.2d 1040 (9th Cir. 1989) ........................................................ 18

*Television Events & Mktg., Inc. v. Amcon Distrib. Co.*,
  526 F. Supp. 2d 1118 (D. Haw. 2007).......................................... 26

## STATUTES

28 U.S.C. § 1332 ................................................................................ 4

Cal. Corp. Code § 17703.04 ............................................................ 28

HRS § 428-201 ................................................................................ 19

HRS § 428-303 ........................................................................... 28, 30

HRS chapter 651C ................................................................ 4, 17, 21, 22

## RULES

FRCP Rule 56(a)............................................................................... 18

## OTHER TREATISES

114 Am. Jur. Proof of Facts 3d 403 (Originally published in 2010) ... 19

**MEMORANDUM IN SUPPORT OF MOTION**

## I.     INTRODUCTION

Each of the three claims brought by Young Men's Christian Association of Honolulu ("Plaintiff") is fundamentally flawed.  Plaintiff's first two claims turn on a single factual issue that is demonstrably false:  Plaintiff's contention that two escrow accounts owned and controlled by Defendant Aloha Kai Development, LLC's ("AKD") members were actually the property of AKD. Plaintiff's third "claim" is not a cause of action and, in any event, is not supported by any facts.  In short, this is a simple case of a sophisticated party deciding to do business with a limited liability company ("LLC") and then regretting that decision.  It should be quickly rejected.

Following a competitive bid process, Plaintiff and AKD entered into a Purchase and Sale Agreement ("PSA") for Plaintiff's Central Branch property at 401 Atkinson Drive, Honolulu, Hawai'i 96814 (the "Property").  The PSA was not guaranteed by any member of AKD or any of the other defendants in this matter. It did, however, contain a $500,000 "Developer's Deposit," which was increased to $1,000,000 just days after the parties entered into the PSA.

Plaintiff terminated the PSA on July 28, 2016, and initiated arbitration against AKD shortly thereafter (the "Arbitration").  During the course of the Arbitration, which Arbitrator David Fairbanks observed was "vigorously

prosecuted and contested," Plaintiff sought to exclude AKD's two members,

Defendants MB Property Acquisitions, LLC ("MBPA") and Tama Home America,

LLC ("THA") from participating in any way. Plaintiff argued that the members

should be barred from the Arbitration because AKD was "a legal entity distinct

from its members." The Arbitrator agreed with Plaintiff and excluded MBPA and

THA from participating in—or even observing—the Arbitration.

Thereafter, Plaintiff sought to have the Arbitrator enjoin funds which

MBPA and THA had placed into escrow accounts in August 2016, after Plaintiff

terminated the PSA. The funds Plaintiff sought to enjoin were contingent loans

and contributions from MBPA and THA that AKD did not, and could not, have an

interest in unless the transaction with Plaintiff closed. The contingent proceeds

were placed into two separate holding escrow accounts with Title Guaranty

Hawaiʻi, Inc. ("TG"): Escrow No. 210-16081761 ("MBPA Holding Escrow

Account") and Escrow No. 210-16081361 ("THA Holding Escrow Account")

(collectively the "Holding Escrow Accounts"). At all times, the Holding Escrow

Accounts were owned and controlled by MBPA and THA, and AKD had no

interest in them. AKD had its own escrow account with TG, Escrow No. T2-101-

0759 ("Project Escrow Account"). Despite the existence of the separately

controlled accounts, Plaintiff argued to the Arbitrator that AKD actually controlled

all the accounts and, thus, the Arbitrator could enjoin the funds belonging to

MBPA and THA. The Arbitrator reviewed the relevant escrow and loan documents and denied Plaintiff's request. In so doing, the Arbitrator rejected Plaintiff's arguments that AKD controlled the funds in the Holding Escrow Accounts.

Plaintiff, represented by experienced counsel, and with full knowledge that AKD was a limited liability company legally "distinct from its members," nevertheless, sought to continue to prosecute a claim solely against AKD and incur extensive attorneys' fees and costs. A hearing was held before the Arbitrator from December 4, 2017 to December 12, 2017. The Arbitrator issued his decision in favor of Plaintiff on January 31, 2018, which specifically incorporated his ruling (1) granting Plaintiff's motion to exclude AKD's members and (2) denying Plaintiff's motion to enjoin MBPA's and THA's contingent funds. The Arbitrator's Final Award was thereafter confirmed, which confirmation also specifically included the Arbitrator's rulings to (1) exclude AKD's members and (2) not enjoin the continent funds.

Through the current lawsuit, Plaintiff seeks to improperly enforce the arbitration award it obtained solely as to AKD against MBPA, THA and also, evidently, non-AKD members Defendants Michael Blumenthal and Tama Home Co., Ltd., a Japanese corporation ("Tama Home Co."). More specifically, Plaintiff alleges claims against all five Defendants under the Uniform Fraudulent Transfer

Act ("UFTA"), HRS chapter 651C, claiming that AKD transferred its assets to others to avoid liability to Plaintiff and also attempts to bring an independent claim to "pierce the corporate veil." As set forth more fully below, Plaintiff's claims cannot survive summary judgment.

First, the UFTA "only applies to transfers by a debtor . . . of the debtor's own property." *In re Sia*, 349 B.R. 640, 652 (Bankr. D. Haw. 2006) (emphasis added). The undisputed evidence is that AKD did not have an interest in the THA Holding Escrow Account or the MBPA Holding Escrow Account and, thus, any transfer of the funds, was not a transfer of AKD's "own property," as is required to be actionable under the UFTA. Second, Plaintiff's claim to "pierce the corporate veil" also fails. Hawai'i law, which applies the alter ego doctrine to claims to pierce the corporate veil, does not recognize an independent claim for alter ego.[1] Moreover, even assuming an independent claim could be brought to "pierce the corporate veil," Plaintiff's allegations in the Complaint are not sufficient to state a claim for alter ego, particularly where Plaintiff, as a sophisticated party, entered into the PSA with knowledge that AKD was a limited liability company.

---

[1] Plaintiff asserts this Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332. Federal courts sitting in diversity apply state substantive law and federal procedural law. *Hanna v. Plumer*, 380 U.S. 460, 465, (1965); *Erie v. Tompkins*, 304 U.S. 64, 78 (1938).

## II.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  AKD Was Formed as a Limited Liability Company Whose Sole Purpose Was Entering into and Performing the PSA

On or about November 1, 2012, AKD was organized as a Hawaiʻi LLC, by filing its Articles of Incorporation with the State of Hawaiʻi, Department of Commerce and Consumer Affairs.  (Separate Concise Statement of Facts ("CS") ¶ 1.)  AKD is a two-member LLC with MBPA and THA as its members.  (CS ¶ 2.) AKD was organized as a manager-managed LLC for the sole purpose of entering into the PSA and completing the proposed projects on the Property, a purpose of which Plaintiff was aware.  (CS ¶¶ 3, 9.)  The publicly available Articles of Incorporation specify that AKD's members "[s]hall not be liable for the debts, obligations and liabilities of the company."  (CS ¶ 4.)

AKD was initially funded by capital contributions from MBPA and THA in the amount of approximately \$1,920,000.  (CS ¶ 5.)  The parties also reached an agreement as to how they would split the next \$3,000,000 of development costs.  (CS ¶ 6.)

**B.** **The Parties Entered into the PSA, Which Was Thereafter Terminated by Plaintiff**

AKD initially entered into the PSA with MBPA on April 2, 2012. (*See* Blumenthal Decl., ¶ 5.[2]) On October 13, 2014, Plaintiff entered into an Amended and Restated PSA that replaced MBPA with AKD. (CS ¶ 7.) Plaintiff was advised by experienced real estate counsel, and Plaintiff understood that it was entering into an agreement solely with a special purpose entity, not the entities' members. (CS ¶¶ 8–9.) The PSA was not personally guaranteed by MPBA, Mr. Blumenthal, THA or Tama Home Co. (CS ¶ 10.) Instead, the PSA was secured with an initial deposit of $1,000,000, which was held in escrow. (CS ¶ 11.)

After entering into the Amended and Restated PSA, Plaintiff and AKD worked towards a closing throughout 2015 and early 2016. (Blumenthal Decl., ¶ 15.) During the course of these efforts, AKD released to Plaintiff $800,000.00 of the $1,000,00.00 held in escrow as a non-refundable deposit. (*Id.* ¶ 16.) On June 6, 2016, Plaintiff sent a notice of default to AKD pursuant to the PSA, suggesting that AKD was unwilling or unable to close the transaction. (CS ¶ 12.) Plaintiff has also alleged that it was concerned AKD "did not have the funding to close on the PSA." (CS ¶ 13.)

---

[2] We have omitted from the CS facts that are not necessary to the determination of the Motion, and that have been provided solely for background purposes.

On July 22, 2016, AKD, through counsel, provided Plaintiff's counsel, with a "proof of funds" letter which included account statements from THA, MBPA and Mr. Blumenthal for $21,153,788.51. (CS ¶ 14.) The cover letter and attached account statements indicate that the funds were not in the possession of AKD but were in the custody of THA, MBPA and Mr. Blumenthal. (CS ¶ 14.) Thereafter, on July 28, 2016, Plaintiff sent a letter to AKD terminating the PSA. (CS ¶ 15.) Contrary to Plaintiff's termination, AKD believed that a deal had been reached with Plaintiff and that it had performed as required under the PSA. (CS ¶ 16.)

### C. MBPA and THA Funded Holding Escrow Accounts in their Names With Conditional Loans to Close a Potential Deal with Plaintiff

Despite Plaintiff's purported termination of the PSA, the parties continued to negotiate to close the transaction. (CS ¶ 17.) Accordingly, MBPA and THA reached an agreement to fund the purchase price of the Property through loans and capital contributions if the sale closed. (CS ¶ 18.) This agreement was made contingent on a final closing with Plaintiff. (CS ¶ 19.) Moreover, the loan funds were to be secured by a mortgage on the Property after it was acquired by AKD. (CS ¶ 20.)

On or about August 9, 2016, MBPA deposited its contingent capital contribution into its escrow account (*i.e.*, the MPBA Holding Escrow Account).

(CS ¶ 24.)  On August 10, 2016, THA deposited its contingent capital contribution and loan funds into its escrow account (*i.e.*, the THA Holding Escrow Account). (CS ¶ 24.)  AKD had no rights, interest, or ownership in the Holding Escrow Accounts.  (CS ¶ 23.)

The escrow instructions provided to TG made clear that MBPA's and THA's funds in the Holding Escrow Accounts were to be transferred to the Project Escrow Account if, and only if, numerous conditions precedent were established, including all requirements needed to close under the PSA.  (CS ¶ 26.)  For instance, the escrow instructions provided to TG by THA stated that the funds were to be transferred to the Project Escrow Account "if, and only if, <u>all</u> of the following conditions precedent have been satisfied":

> (a) You have receive oral or written communications (sent by facsimile or electronic mail) from THA instructing you to record and/or file the Loan Documents as described in Section 6 of these instructions;
>
> (b) [TG] has issued to THA, or is hereby irrevocably and unconditionally obligated to issue to THA a lender's policy of title insurance in favor of THA . . . ;
>
> (c) You have received the Equity Funds and Loan Proceeds in the Holding Account, and you are prepared to disburse all of such funds as provided in a tentative closing statement approved by THA and AKD ("Settlement Statement");
>
> (d) You have received additional funds of not less than U.S. $2,500,000.00 from [MBPA] . . . ; and

> (e) You have received all other funds, documents and instruments necessary for closing the purchase of the YMCA Site by AKD pursuant to the Purchase Agreement, <u>and all conditions to said closing have been satisfied except for those conditions to be satisfied by the disbursement of the Equity Funds and Loan Proceeds herein</u>.

(CS ¶ 26 (emphasis added).) Escrow instructions provided by AKD on behalf of both members contained similar requirements. (CS ¶ 26.) In sum, the escrow instructions explicitly stated that, if the sale to AKD was not completed, the amounts would <u>not</u> be loaned to AKD and would remain the property of the respective members. The Holding Escrow Accounts were completely separate from the Project Account held by AKD, and AKD never had any rights, interest, or ownership over the Holding Escrow Accounts. (CS ¶ 23.)

On August 11, 2016, as part of its continued efforts to resurrect the deal with Plaintiff, AKD sent a letter to YMCA which stated "[a]ll funds required to close per the PSA, as amended, have been deposited with and are being held by TG." (CS ¶ 27.) Attached to the letter was an email from TG specifying the funds were held as follows:

> 1. Escrow No. T2-101-0750 [Project Escrow Account]- $200,000.00
>
> 2. Escrow No. 210-16081361 [THA Holding Escrow Account]- $16,350,000.00
>
> 3. Escrow No. 210-16081761 [MBPA Holding Escrow Account]- $2,500,000.00

(CS ¶ 27.)

The deal never closed. (CS ¶ 28.) Therefore, the conditions to closing set forth in the escrow instructions were not triggered and the funds in the Holding Escrow Accounts were never loaned or otherwise released to AKD. (CS ¶ 28.) However, MBPA and THA did not immediately transfer the funds out of their respective escrow accounts because they hoped that the deal could be salvaged. (CS ¶ 29.)

**D. Plaintiff Initiated Arbitration Against AKD**

On or about November 30, 2016, Plaintiff initiated the Arbitration against AKD by submitting a Demand for Arbitration ("Arbitration Demand") with Dispute Prevention & Resolution, Inc. ("DPR"). (Ando Dec. ¶ 5.) In the Arbitration Demand, Plaintiff alleged that it believed that ADK "did not have the funding to close on the PSA." (Ex. 13 at ¶ 32.)

AKD submitted an Answer to the Arbitration Demand and Counterclaim on December 22, 2016, denying Plaintiff's allegations and seeking to enforce a settlement agreement reached between the parties on June 30, 2018. (Ex. 14 at Y001101–02.) AKD asserted other claims against Plaintiff, including unjust enrichment related to the benefits Plaintiff received for AKD's efforts to rezone the property, the $800,000 AKD had already released, the $200,000 remaining in escrow and the substantial amounts spent by AKD to subdivide the

Property, obtain entitlements and design a facility for Plaintiff on the Property.

(*See generally* Ex. 14.)

### 1. Plaintiff's Efforts to Exclude MBPA and THA from the Arbitration

On February 9, 2017, Plaintiff filed a Motion to Preserve

Confidentiality of Arbitration Proceedings, which, in reality, sought to exclude

AKD's members, MBPA and THA, from participating in the arbitration

proceedings ("Motion to Exclude").  Plaintiff argued that:

> The fact that AKD is a limited liability company and the non-parties at issue are members does not mean that they should be able to participate. . . . . <u>Presumably the non-party members of AKD would resist any attempt to pierce the corporate veil and be held liable for any judgment against AKD in this case. They should therefore not be able to use corporate structures when it suits them, but argue they are unimportant when they claim an interest in the arbitration and a "right" to participate in proceedings.</u>

(CS ¶ 30 (emphasis added).)

In its reply in support of its Motion to Exclude, Plaintiff continued to

argue that the members of AKD did not have a right to participate in the

Arbitration, contending that:

> AKD is also wrong that an LLC member has a "direct interest" in an arbitration proceeding involving the LLC.  AKD has a "direct" interest in the arbitration.  Its members do not.  If anything, an LLC member's interest is a perfect example of an "indirect" interest.  The ***purpose*** of an LLC is to create "a legal entity distinct from its members."  HRS § 408-201.  Moreover, AKD is a manager-managed LLC not a member-managed LLC.

This choice even further separates AKD's members from the operations of AKD, <u>and thus protects them from the potential associated liability</u>.  For example, unlike a member-managed LLC, the members of a manager-managed LLC 1) cannot accept service of process; 2) cannot certify the records or filings to the DCCA; 3) are not agents of the LLC; 4) cannot execute documents transferring real property on behalf of the LLC; and 5) have no rights to the management of an LLC, which are vested exclusively in the managers.  Indeed, under the LLC Act, members do not even owe a duty of loyalty to a manager-managed LLC.  HRS § 408-201.

(CS ¶ 31 (footnotes and internal citation omitted; bold italics in original; underlining added).)

On March 13, 2017, the Arbitrator granted Plaintiff's Motion to Exclude, recognizing that AKD, as an LLC, "is a legal entity distinct from its members" and, as a manager-managed limited liability company, only AKD's managers had the authority to conduct AKD's business.  (CS ¶ 32.)  Accordingly, the Arbitrator determined that MBPA and THA, as members of AKD, did not have a right to attend and observe the Arbitration and must be excluded.

### 2. Plaintiff's Efforts to Enjoin the Holding Escrow Accounts Belonging to MBPA and THA

Thereafter, on July 11, 2017, Plaintiff submitted a Motion for Preliminary Injunction, seeking to have the Arbitrator enjoin MBPA and THA from removing funds held in the MBPA Holding Escrow Account and the THA Holding Escrow Account.  (CS ¶ 33.)  Despite acknowledging that the funds came from MBPA and THA, Plaintiff asserted that transfer of the MBPA and THA

contingency funds from the Holding Escrow Accounts would leave it without "recourse to recover" its alleged damages. (CS ¶ 34.)

On July 31, 2017, AKD submitted an opposition to Plaintiff's Motion for Preliminary Injunction. (CS ¶ 35.) In its opposition, AKD explained that: "As conceded by [Plaintiff], the escrow funds were deposited by non-parties [THA] and [MBPA], who are currently the owners of those funds until the transaction closes and the loans from [THA] and MBPA to AKD close." (Ex. 19 at MB000184.) AKD further clarified that the subject escrow accounts did "not belong to AKD":

> First and foremost, the funds in these Escrow Holding Accounts are funds that belong to [THA] and MBPA, respectively. As these Escrow Holding Accounts do not belong to AKD, the Arbitrator is without the power or authority to enjoin non-parties [THA] and [MBPA] from withdrawing their funds, individually or collectively, from these accounts. See, e.g., Comedy Club, Inc. v. Improv West Associates, 553 F.3d 1277 (9th Cir. 2009) (arbitrator exceeded scope of his authority as matter of California law in issuing permanent injunctions to bind relatives who were not parties to the agreement). See Exhibit A (Letter from Nancy J. Youngren, Esq. to Wesley Chang, Esq., dated July 20, 2016); Exhibit B (Letter from Nancy J. Youngren, Esq. to Title Guaranty Escrow Services, Inc., dated August 10, 2016, without enclosure)[.]
>
> Moreover, the funds in these Escrow Holding Accounts include monies to be loaned to AKD to close AKD's purchase of the YMCA Site in accordance with the PSA. Regarding the larger account belonging to [THA] (Escrow No. 210-16081361), this account includes monies that were

to be loaned to AKD **if, and only if, *all* of the . . . conditions precedent [were] satisfied[.]**

. . . .

The loan and equity funds contained in Escrow No. 210-16081361 were for the sole purpose of closing the purchase of the property from the YMCA. [THA]'s loan was to be secured by a mortgage on the YMCA's property acquired by AKD from the YMCA at closing. Thus, there is no way that the loan could have closed without the closing of the purchase of the YMCA property by AKD as evidenced by the requirement above regarding a title insurance policy. This is similar to a typical residential (or commercial) mortgage loan where the lender makes the loan for the specific purpose of acquiring a property (which will secure the loan) and the funds are not loaned unless the property is actually acquired. The loan and equity funds in Tama Home's Escrow No. 210-16081361 cannot be used for any other purpose. If the purchase does not close, the funds are not released, and remain [THA]'s funds.

The other Escrow Holding Account (Escrow No. 210-16081761), which belonged to MBPA, also contained similar provisions regarding monies that were loaned to AKD. Those provisions instruct escrow to hold all funds and wait for further instructions if closing did not occur by August 29, 2016. The Escrow Holding Accounts would only release funds to the Project escrow upon closing.

[THA]'s and MBPA's escrow instructions to the Title Company clearly contemplated that if the conditions precedent to closing the loan and equity contributions, which included closing of the purchase of the YMCA property by AKD, did not take place or were unsatisfied, the funds in the Escrow Holding Account Nos. 210-16081361 and 210-16081761 were to be returned to [THA] and MBPA, respectively. Since the YMCA did not deliver the documents and instruments necessary to close the purchase of the YMCA Site and instead has taken the position that it had terminated the PSA, the monies in these

14

> Escrow Holding Accounts was never loaned by THA and
> MBPA to AKD.

(*Id.* at MB00187–89 (footnote omitted; emphasis in original).)  AKD further set

forth arguments related to Plaintiff's failure to satisfy the elements necessary for

issuance of a preliminary injunction.

On August 4, 2017, MPBA and THA instructed TG to return the funds

in their respective Holding Escrow Accounts to them.  (CS ¶ 36.)  The transfer of

funds was completed on August 4, 2017 and August 7, 2017, respectively.   (CS

¶ 36.)

On August 8, 2017, AKD submitted a supplemental memorandum to

the Arbitrator, indicating that MBPA and THA had transferred funds out of the

Holding Escrow Accounts.  (CS ¶ 37.)  That same day, Plaintiff submitted a reply

in support of its Motion for Preliminary Injunction.  Plaintiff asserted that the

Arbitrator had the power to enjoin AKD and "those persons in active concert or

participation with them, even if not parties to this arbitration.'"  (CS ¶ 38.)  In

support of such argument, Plaintiff argued that its Motion for Preliminary

Injunction was not moot, despite the non-parties' transfer of their own funds,

because "[t]he truth of the matter is that AKD controls the escrow funds."  (CS

¶ 38.)

On August 25, 2017, a hearing was held on the Plaintiff's Motion for

Preliminary Injunction.  (Ando Decl. ¶ 10.)  During the hearing, the Arbitrator

requested additional information and, on August 30, 2017, AKD provided the Arbitrator with, *inter alia,* the MPBA and THA escrow instructions, which established that the funds in the MBPA Holding Escrow Account and the THA Holding Escrow Account were held by MBPA and THA.  (CS ¶ 39.)

After having reviewed the relevant documents and escrow instructions, the Arbitrator issued his ruling on Plaintiff's Motion for Preliminary Injunction on September 1, 2017.  (CS ¶ 40.)  In his ruling, the Arbitrator rejected Plaintiff's assertions that AKD controlled the escrow funds and held that, based on the transfer of the funds from the MBPA Holding Escrow Account and the THA Holding Escrow Account, Plaintiff's Motion was moot.  (CS ¶ 40.)  With the explicit knowledge that AKD did not have control over the funds in the Holding Escrow Accounts, and that such funds had been transferred, Plaintiff proceeded forward with its claims against the <u>limited liability company</u> AKD.

### 3.    Arbitration Award

An arbitration hearing was held from December 4, 2017 through December 12, 2017.  (Ando Decl. ¶ 12.)  On January 31, 2018, the Arbitrator issued his Findings of Fact, Conclusions of Law, and Order ("FOF/COL") finding in favor of Plaintiff and awarding liquidated damages and attorneys' fees.  (*See generally* Ex. 24.)  The FOF/COL incorporated, *inter alia*, the Arbitrator's ruling on Plaintiff's March 13, 2017 Motion to Exclude and Plaintiff's July 11, 2017

Motion for Preliminary Injunction.  (CS ¶ 41.)  The Arbitrator's Final Award was Confirmed by this Court.  (CS ¶ 42.)

### E.    Relevant Procedural History

On June 20, 2018, Plaintiff filed the instant Complaint against AKD, MBPA, Michael Blumenthal, THA and Tama Home Co., based on diversity jurisdiction, alleging claims for (1) "Intentional Fraudulent Transfer" pursuant to HRS § 651C-4(a)(1) (Count I), (2) "Constructive Fraudulent Transfer" pursuant to HRS § 651C-4(a)(2) (Count II) and (3) "Non-Payment of Arbitration Award and Piercing Corporate Veil" (Count III).  (ECF No. 1.)  AKD filed an Answer on July 13, 2018 and a First Amended Answer and Counterclaim on August 3, 2018.  (ECF No. 20.)  THA filed an Answer on July 16, 2018 and a First Amended Answer and Counterclaim on July 26, 2018.  (ECF No. 19.)  MBPA and Mr. Blumenthal filed their Answer on July 24, 2018 and an Amended Answer and Counterclaim on August 14, 2018.  (ECF No. 25.)  Issues remain as to whether Tama Home Co. has been properly served in Japan; as such, Tama Home Co. has not yet filed a response to Plaintiff's Complaint.

## III.    LEGAL STANDARD

The Federal Rules of Civil Procedure ("FRCP") provide for summary adjudication when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the declaration or affidavits, if any, show that

"there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." FRCP Rule 56(a). A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

In determining summary judgment, a court applies a burden-shifting analysis. When the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *Id*. at 323–24.

If the moving party satisfies its initial burden, the burden then shifts to the opposing party to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 324.

## IV.   ARGUMENT

"A basic tenet of American corporate law is that the corporation and its shareholders are distinct entities." *Dole Food Co. v. Patrickson*, 538 U.S. 468, 474 (2003).  This principal applies to all corporate forms, including limited liability companies.  HRS § 428-201 ("A limited liability company is a legal entity distinct from its members.")).  Indeed, the corporate form was created to allow shareholders to invest without incurring personal liability for the acts of the corporation.  114 Am. Jur. Proof of Facts 3d 403 (Originally published in 2010).

> Consequently, the liability of an individual for the obligations of an entity is limited to his or her interest in the entity. This concept of limited liability has been called the most attractive feature of corporation. Often, it is the primary reason for incorporation. The purpose of limited liability is to promote commerce and industrial growth by encouraging shareholders to make capital contributions to corporations without subjecting their personal wealth to the risks of business. This incentive to business investment has been called the most important legal development of the 19th century.

*Id.* (footnotes omitted).

Plaintiff seeks through the instant action to have the Court disregard the aforementioned well-settled principals—despite Plaintiff's knowledge of AKD's corporate structure and finances when it entered the PSA with AKD and pursued arbitration against it—and reach into the pockets of AKD's members (and beyond) to obtain funds that were never in the possession of AKD.  Such request is not supported in law or equity.

It is undisputed that AKD is a separate and distinct legal entity from its members, THA and MPBA.  (CS ¶¶ 1–4.)  THA and MBPA were not parties to the PSA.  (CS ¶¶ 7, 9.)  THA and MBPA did not guarantee the PSA or any amendment thereto.  (CS ¶ 10.)  Moreover, as is usual in most real estate transactions, the purchase price of the Property was to be funded by contributions and loans, which were not to be released to AKD (and, thus, Plaintiff) until the PSA was closed upon, an event that never occurred.  (CS ¶ 28.)

Therefore, as set forth more fully below, the UFTA is not applicable here because, in order to be actionable, the UFTA requires as a threshold matter that there is a "transfer" of an "asset" owned by a debtor.  Plaintiff's claims under the UFTA fail because, as the undisputed facts demonstrate and as was previously ruled upon by the Arbitrator, AKD did not own or have ownership of the funds in the Holding Escrow Accounts (*i.e.,* such funds were not an "asset" of AKD).  Consequently, AKD, did not transfer an asset when THA and MPBA removed their own funds from their respective Holding Escrow Accounts.

Moreover, Plaintiff's claim to "pierce the corporate veil" is not an independent claim under Hawaiʻi law and, thus, must be dismissed.  Even assuming Plaintiff could bring such a claim, it cannot be enforced where Plaintiff, a sophisticated entity advised by experienced counsel, entered into the PSA and

pursued the Arbitration with full and complete knowledge of AKD's limited liability status.

**A.** **Plaintiff's Claims in Count I and II for Intentional and Constructive Fraudulent Transfers Fail Because AKD Did Not Make a "Transfer" of an "Asset"**

In Counts I and II, Plaintiff alleges claims against AKD under HRS chapter 651C, asserting intentional fraudulent transfers and constructive fraudulent transfers, respectively. As the factual basis for such claims, Plaintiff claims that (1), with respect to Count I, "AKD transferred assets to THA and MBPA in August 2017 with the actual intent to avoid paying an arbitration award" and (2), with respect to Count II, "AKD transferred assets to THA and MPBA in August 2017 without receiving any value for the transfer, let alone reasonably equivalent value." (Complaint at ¶¶ 37, 41 (emphases added.))

HRS § 651C-4 provides, in relevant part:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) With actual intent to hinder, delay, or defraud any creditor of the debtor; or

(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor

were unreasonably small in relation to the business or transaction; or

(B) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

(Emphases added.)  By its plain language, HRS §§ 651C-4(a)(1) and (2) require that, to be actionable, a "transfer" be made by a debtor.  The UFTA defines "transfer" as "<u>disposing of or parting with an asset or an interest in an asset</u>, and includes a payment of money, a release, a lease, and the creation of a lien or encumbrance."  HRS § 651C–1 (emphasis added).  In turn, "asset" is defined as "property of a debtor."  (*Id.*)

In this regard, "<u>the UFTA only applies to transfers by a debtor . . . of the debtor's own property</u>."  *In re Sia*, 349 B.R. 640, 652 (Bankr. D. Haw. 2006) (emphasis added).

A fraudulent transfer is a transfer made by a debtor. [HRS] § 651C–4(a).  The "transfer" must be of an "asset". [HRS] § 651C–1. The term "asset" means property of a debtor.  [HRS] § 651C–1.

*Id.*; *see also All. Bancorp v. Select Mortg., L.L.C.*, No. 274853, 2008 WL 724092, at *2 (Mich. Ct. App. Mar. 18, 2008) (advising that a party must have ownership or legal title to property before it can be the subject of a "transfer" under the UFTA).  *Cf. In re Milby*, 875 F.3d 1229, 1235 (9th Cir. 2017) (claim for fraudulent transfer

under the federal bankruptcy code was not supported where the allegations involved transfers from bank accounts in the names of non-debtor defendants).

As set forth above, the threshold question for the application of the UFTA is whether the "debtor," here alleged by Plaintiff to be AKD, "transferred" its "assets." There is no genuine dispute that AKD did not transfer any of its own assets. The escrow instructions to TG specified that the funds from THA and MBPA were to be held separately in Holding Escrow Accounts until conditions precedent to releasing the funds were completed, including that a tentative closing statement was approved by THA and AKD. (CS ¶ 26.) There is no evidence that the funds in the Holding Escrow Accounts were ever in the possession of AKD. (CS ¶¶ 19, 22, 23.) Indeed, the AKD capital account did not reflect any additional equity contributions from MBPA or THA as a result of the monies that MBPA and THA placed in their Holding Escrow Accounts. (CS ¶ 36.) Thus, inasmuch as "the UFTA only applies to transfers by a debtor . . . of the debtor's own property," *In re Sia*, 349 B.R. at 652, and AKD did not transfer its own property, Plaintiff's claims under the UFTA fail.

Not only is any assertion by Plaintiff that AKD owned or controlled the funds flatly contradicted by the facts, but it is also barred by the doctrine of

collateral estoppel.[3] "Collateral estoppel is an aspect of *res judicata* which precludes the relitigation of a fact or issue which was previously determined in a prior suit on a different claim between the same parties or their privies." *Dorrance v. Lee*, 90 Hawai'i 143, 148, 976 P.2d 904, 909 (1999). Issue preclusion, or collateral estoppel, "prevents the parties or their privies from relitigating *any issue* that was actually litigated and finally decided in the earlier action." *Id.* (emphasis in original). There is a three-prong test to determine whether the doctrine of collateral estoppel bars relitigation of an issue. *Id.* Collateral estoppel will bar relitigation where:

> (1) the issue decided in the prior adjudication is identical with the one presented in the action in question, (2) there was final judgment on the merits, and (3) the party against whom res judicata is asserted was a party or in privity with a party to the prior adjudication.

*Id.* (citation omitted.)

Plaintiff argued in the Arbitration that the funds in the Holding Escrow Accounts could be enjoined because "[t]he truth of the matter is that AKD controls the escrow funds." (CS ¶ 38.) The Arbitrator rejected Plaintiff's assertion

---

[3] Further, any claim by Plaintiff that AKD "controlled" the subject funds is irrelevant. The plain language of the Chapter 651C requires a transfer of an "asset" and an "asset" is defined as property of the debtor. Thus, whether a party had control over property it did not own is not relevant to a fraudulent transfer claim.

when it determined that the issue was moot because AKD did not control the subject funds. (CS ¶ 40.) Thus, the identical issue was decided in the Arbitration.

Further, there is a final judgment on the merits because "[a]n arbitration award that has been reduced to a judgment is a final judgment for purposes of collateral estoppel." *Dorrance*, 90 Hawai'i at 148, 976 P.2d at 909; *see also* CS ¶ 42. Lastly, AKD and Plaintiff were both parties to the Arbitration and, thus, the party or privity prong is also met here.

Based on the foregoing, summary judgment should be granted in AKD's favor on Count I and Count II of Plaintiff's Complaint because the UFTA does not apply and, alternatively, because the doctrine of collateral estoppel bars relitigation of the underlying issues.

### B. Plaintiff's Claim to "Peirce the Corporate Veil" Must Be Dismissed Because it is Not an Independent Claim and Plaintiff Has Not Alleged Sufficient Facts to State a Claim

In Count III, Plaintiff brings a claim to "pierce the corporate veil." Plaintiff alleges that, with respect to AKD, "[t]he members of AKD have used it as a shell company and kept AKD undercapitalized specifically to avoid having to pay obligations to creditors like the YMCA." (Complaint at ¶ 49.) Plaintiff also generally asserts that AKD's managers "never acted independently" and AKD "largely operates without observing corporate formalities." (*Id.* at ¶¶ 33–34.) Based on these allegations—and nothing else—Plaintiff asserts that the Court

should pierce the corporate veil between AKD and its members, MBPA and THA. (*Id.*)

### 1. "Piercing the Corporate Veil" Is Not an Independent Cause of Action

A claim to pierce the corporate veil is not itself an independent cause of action. *Peacock v. Thomas*, 516 U.S. 349, 354 (1996) (citation omitted). Hawaiʻi uses the alter ego test for determining whether the corporate veil of an entity should be pierced. *Robert's Hawaii School Bus, Inc. v. Laupahoehoe Transp. Co., Inc.,* 91 Hawaiʻi 224, 241, 982 P.2d 853, 870 (1999). There is not an independent cause of action to pierce the corporate veil under the alter ego doctrine. *See Television Events & Mktg., Inc. v. Amcon Distrib. Co.*, 526 F. Supp. 2d 1118, 1128 (D. Haw. 2007) ("[l]iability under the alter ego doctrine and the theory of piercing the corporate veil are not independent causes of action" (citing *Robert's Hawaii School Bus, Inc,* 91 Hawaiʻi at 241, 982 P.2d at 870.)) A majority of courts have agreed that "an alter ego claim does not constitute an independent action." *See Five Points Hotel P'ship v. Pinsonneault*, No. CV-11-00548-PHX-JAT, 2014 WL 1713623, at *3 (D. Ariz. May 1, 2014), *aff'd*, 697 Fed. Appx. 549 (9th Cir. 2017) (collecting cases that hold an alter ego claim is not a separate and independent cause of action and dismissing the plaintiff's alter ego claim for failure to state a claim)*; see also Rosen v. Kessler,* 51 A.D.3d 761 (N.Y. App. Div.2008) ("The doctrine of res judicata precludes the instant action because, *inter*

*alia*, it arises from the same transactions as a prior action . . . and, given that New York does not recognize a separate cause of action to pierce the corporate veil . . . it differs from the prior action only in the theory of recovery . . . ." (internal citations omitted)); *cf. Feitshans v. Kahn,* No. 06 Civ. 2125, 2006 WL 2714706, at *4 (S.D.N.Y. Sept. 21, 2006) (finding plaintiffs' claims seeking to hold new defendants responsible as alter-egos for breaches of contract by defunct corporations were barred by res judicata because plaintiffs sought "to relitigate the very same claims that ha[d] already been decided" and they were entitled to only "one recovery for a single wrong," even where different legal theories as to recovery were presented).

Inasmuch as an alter ego claim or a claim to "pierce the corporate veil" is not an independent claim, Count III must be dismissed. Even assuming Plaintiff could bring an independent claim to "pierce the corporate veil" it cannot establish such a claim based on the allegations within the Complaint and, thus, Plaintiff's claim must be dismissed or summary judgment must be entered in favor of AKD.

### 2. The Corporate Veil Cannot Be Pierced Where Plaintiff Entered into the PSA With Full Knowledge that AKD Was a Limited Liability Company

Hawai‘i courts are "reluctant to disregard the corporate entity." *Robert's Hawaii*, 91 Hawai‘i at 241 n. 12, 982 P.2d at 870 n. 12. Indeed, the

Hawai'i Uniform Limited Liability Company Act specifically states that "[a] member or manager **shall not** be personally liable for any debt, obligation, or liability of the company solely by reason of being or acting as a member or a manager." HRS § 428-303(a) (emphasis added).[4]

Even assuming the alter ego doctrine would apply to AKD as a limited liability corporation, the corporate form will be disregarded "only where recognition of the corporate fiction would bring about injustice and inequity or when there is evidence that the corporate fiction has been used to perpetrate a fraud or defeat a rightful claim." *Chung v. Animal Clinic, Inc.,* 63 Haw. 642, 645, 636 P.2d 721, 723 (1981). The Hawai'i Supreme Court has listed more than twenty factors to evaluate whether one entity is another's alter ego, among them whether the companies commingled funds, employed the same people, have identical ownership, or have shared directors and officers with supervisory or managerial responsibilities over both companies. *Robert's Hawaii School Bus, Inc.,* 91 Hawai'i at 241–43, 982 P.2d at 870–72 (citing *Associated Vendors, Inc. v. Oakland Meat Co.,* 210 Cal. App. 2d 825, 26 Cal. Rptr. 806, 813 (1962)). More specifically, the Hawai'i Supreme Court has set forth a non-exhaustive list of

---

[4] The limits put on the liability of members and managers of limited liability companies by the Hawai'i legislature are significantly stricter than other states, like California. *Compare* HRS § 428-303 *with* Cal. Corp. Code § 17703.04.

factors that may be weighed in determining whether a corporate entity is the alter ego of another, which include:

> [1] Commingling of funds and other assets, failure to segregate funds of the separate entities, and the unauthorized diversion of corporate funds or assets to other than corporate uses; [2] the treatment by an individual of the assets of the corporation as his own; [3] the failure to obtain authority to issue stock or to subscribe to or issue the same; [4] the holding out by an individual that he is personally liable for the debts of the corporation; [5] the identical equitable ownership in the two entities; [6] the identification of the equitable owners thereof with the domination and control of the two entities; [7] identi[ty] of ... directors and officers of the two entities in the responsible supervision and management; [8] sole ownership of all of the stock in a corporation by one individual or the members of a family; [9] the use of the same office or business location; [10] the employment of the same employees and/or attorney; [11] the failure to adequately capitalize a corporation; [12] the total absence of corporate assets, and undercapitalization; [13] the use of a corporation as a mere shell, instrumentality or conduit for a single venture or the business of an individual or another corporation; [14] the concealment and misrepresentation of the identity of the responsible ownership, management and financial interest, or concealment of personal business activities; [15] the disregard of legal formalities and the failure to maintain arm's length relationships among related entities; [16] the use of the corporate entity to procure labor, services or merchandise for another person or entity; [17] the diversion stockholder [sic] or other person or entity, to the detriment of creditors, or the manipulation of assets and liabilities between entities so as to concentrate the assets in one and the liabilities in another; [18] the contracting with another with intent to avoid performance by use of a corporate entity as a shield against personal liability, or the use of a corporation as a

> subterfuge of illegal transactions; and [19] the formation
> and use of a corporation to transfer to it the existing
> liability of another person or entity.

*Robert's Hawaii Sch. Bus, Inc.*, 91 Hawai'i at 242, 982 P.2d at 871 (citation

omitted).

Plaintiff appears to alleges only two reasons that the AKD's corporate

form should be disregarded: (1) AKD failed to observe corporate formalities and

its members were not "independent" and (2) AKD was undercapitalized.

(Complaint at ¶¶ 34, 49.) Such allegations are insufficient to state a claim for an

alter ego under Hawai'i law.

First, failure to observe corporate formalities, by itself, is generally

not sufficient to warrant piercing the corporate veil. HRS § 428-303(b) ("The

failure of a limited liability company to observe the usual company formalities or

requirements relating to the exercise of its company powers or management of its

business shall not be a ground for imposing personal liability on the members or

managers for liabilities of the company."); *see also Hilo Crane Serv. v. Ho,* 5 Haw.

App. 360, 374–75, 693 P.2d 412, 422 (1984) (refusing to disregard corporate entity

to apply principle of equitable subordination, stating that "mere control or

domination of a corporation is not proscribed by law and is in itself insufficient to

justify piercing the corporate veil and subordinating claims"); *Henry Waterhouse*

*Trust Co. v. Home Ins. Co. of Hawai'i,* 27 Haw. 572, 582, 586 (1923) (refusing to

pierce corporate veil and stating that party claiming corporation is mere instrumentality carries the burden of proof); *Baldwin v. Matthew R. White Investments, Inc.*, 669 F. Supp. 1054, 1056–57 (D. Utah 1987). Moreover, AKD did generally follow the required corporate formalities. (CS ¶ 43.) Thus, Plaintiff's allegations in this regard do not establish that AKD was merely an "alter ego" of its members.

Second, Plaintiff asserts that AKD's veil should be pierced because it was "undercapitalized." Generally, a plaintiff's inability to collect a judgment from a corporation is not enough to show that fraud or inequitable conduct resulted from the use of the corporate structure. *See Luckett v. Bethlehem Steel Corp.,* 618 F.2d 1373 (10th Cir. 1980). A decision to the contrary would totally eviscerate the doctrine of limited liability for corporate shareholders, and undermine a fundamental protection that encourages business venture. *Baldwin*, 669 F. Supp. at 1057.

Indeed, where a sophisticated party, such as Plaintiff, enters into a contract knowing that it is dealing with a limited liability entity and fails to ensure that the entity is adequately capitalized to carry out its contractual obligations, the plaintiff is precluded from asserting a veil-piercing claim. As stated in *Advanced Tel. Sys., Inc. v. Com-Net Prof'l Mobile Radio LLC*, 846 A.2d 1264, 1282 (Pa. Super. 2004):

> The facts are that [the plaintiff] knew it was dealing with [the LLC, a limited liability company], knew [the LLC's] liability is very limited, and admits it knew that [the LLC] "would have assets, and $15 million of financing, once [a third-party] signed the various agreements with [the LLC]." Yet when the [third-party] deal fell through, and [the plaintiff], after having received contract payments for six months, was given back its consideration (the 14 radio channels), [plaintiff] tried to obtain more protection than it had bargained for. <u>[Plaintiff] had demanded no guaranties for the [LLC's] obligations yet now it asks the Court, in effect, to provide guaranties after-the-fact</u>.

(Emphasis added.) *See also Serio v. Baystate Properties, LLC,* 60 A.3d 475, 489 (Md. App. 2013) (refusing to pierce the corporate veil where the plaintiff "was an established building contractor who understood and agreed that it was doing business with another limited liability company," as reflected in the parties' agreements, and their continuing course of business); *In re Polo Builders, Inc.*, 388 B.R. 338, 385 (Bankr. N.D. Ill. 2008) (where a sophisticated businessman closed his eyes to facts which should have made him suspicious of the defendants' ability to perform under the Agreement any harm to him did not arise from the defendants' abuse of the corporate form, but rather resulted based on his own lack of due diligence); *DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.,* 540 F.2d 681, 686 n. 13 (4th Cir. 1976) (contract creditors impliedly assume the risk of gross undercapitalization); *Hanson v. Bradley,* 10 N.E.2d 259, 264-65 (Mass.

1937) (fair inference is that salaried employee of corporation knew worthlessness of corporation when he entered into contract for salary).

Here, Plaintiff knew when it entered into the PSA of AKD's limited liability status. Yet, it did not demand guaranties for AKD's purported obligations. Nevertheless, it now asks the Court, in effect, to provide guaranties after-the-fact. In this regard, a decision that would allow Plaintiff to disregard the corporate form because AKD does not have the current ability to pay an arbitration award against it would eviscerate the doctrine of limited liability for LLC members, and undermine a fundamental protection that encourages business ventures. Accordingly, and for the reasons set forth above, Plaintiff's claim to "pierce the corporate veil" fails.

## V.    CONCLUSION

For the foregoing reasons, AKD respectfully requests the Court grant its Motion and enter summary judgment in its favor as to Counts I, II and III.

DATED:  Honolulu, Hawai'i, September 28, 2018.

/s/ Randall C. Whattoff
JOACHIM P. COX
RANDALL C. WHATTOFF

Attorneys for Defendant
ALOHA KAI DEVELOPMENT LLC